Good morning, Your Honor. May it please the Court, my name is Roy Englert. I represent the trustee, Irving Picard, and I've reserved five minutes for rebuttal. Bernard Madoff's company was a regulated broker-dealer here in New York that was supposed to protect customer property obtained from all over the world, but instead created fictitious transactions with other people's money. This case is about what remedies are available as the trustee seeks to recover money from the beneficiaries of fraudulent transfers and redistribute it to victims. Because this case involves the fraud of a U.S. broker-dealer, nowhere but here in the United States can a single comprehensive uniform set of remedies be achieved. The Securities Investor Protection Act, SIPA, expressly gives the bankruptcy court exclusive jurisdiction over a broker-dealer in liquidation. But isn't it true that the feed of funds are going through bankruptcy proceedings themselves in their home countries? Yes, Your Honor. And that's Fairfield and others, aren't they? Yes. So why is this the only place where protection can be given to the losers, the net losers? This is the only place where Madoff is, Your Honor, and the fraudulent transfers depend on Madoff's fraudulent conduct. They don't depend on the subsequent conduct. There are maybe defenses based on the subsequent conduct, but the fraudulent transfers are Madoff's initial transfers to the feeder funds. But you're suing to collect for the second transfer from the feeder funds to their investors, and that didn't take place in the United States, did it? No, but the first question in the extraterritoriality inquiry is whether the statute is being applied domestically or extraterritorially, and that depends on the focus of the statute. And the focus of both the relevant SIPA provisions and Sections 548 and 550 of the Bankruptcy Code, we respectfully submit, is the initial transfer. There's no reason to chase the money unless you're able to say that the money's inappropriately in someone else's hands. Yes, Your Honor. And so the substantive reason why you're entitled to the money is because of the transfer that occurred in the United States, not the transfers that occurred overseas. Yes, that's right, Your Honor. The overseas transfers are simply tracing matters as opposed to substantive matters. Yes, Judge Wesley. So I don't understand why the District Court thought that it was an overseas transaction. Well, the District Court . . . What about what substantive rights were adjudicated overseas? Well, there are decisions . . . Are there defenses to subsequent transferees with regard to, like, good faith or something like that? No, no. Common law theories have been adjudicated overseas, but nothing about the initial transfer could be adjudicated overseas. Well, the District Court viewed the estate as being depleted when? Because that's the thrust of the Bankruptcy Code. When was the estate actually depleted? When BLMIS paid money to the feeder funds or when the feeder funds paid money to their investors? Definitely the former, Your Honor, because . . . And so why didn't the District Court recognize that? Well, the District . . . Or the two bankruptcy judges who dealt with this case. Well, Judge Liflin did recognize it in his BLI decision, which we think analyzed the issues correctly. Judge Bernstein, bound by Judge Rakoff's ruling after Judge Rakoff removed the reference, did not . . . He had no choice. He had no choice, although I would add that in his Ampel decision issued after . . . He found it the exact opposite as a subsequent decision, where it wasn't bound by the District Court. Yes. In the foreign proceedings, the liquidation of the foreign funds, are those distributions being made on a per-share basis or on a per-unit of interest basis? I don't know, Your Honor. Or is this some discrimination based on who are net winners and who are net losers? What the foreign funds are doing in their distributions, I don't know. And that's really not the trustee's concern. There's a substantive reason why I don't know it. The way this works is, the direct customers are those pursued by the trustee, and that's the feeder funds. But if the feeder funds recover money, they can redistribute it to their shareholders and other stakeholders as appropriate for them. You're seeking the right here to go after the feeder funds payees, the people that they paid, their investors. Yes, Judge Gore. I know this is sort of extra record, but will it really be financially viable for you to track down individuals who . . . and get default judgments or affect service all over the world? Have you considered the cost-benefit analysis of being able to sue those people? Yes, Your Honor. My client has certainly considered that. This is $4 billion of transfers at stake . . . That's an eye-popping number. . . in this litigation, and there were some large investors in the feeder funds as well as small investors in the feeder funds. And you know where they are. Enough to make it very much worthwhile to go after them, and indeed, these lawsuits are against the managers, shareholders, and service providers of the feeder funds. They have already been sued. It's not a matter of tracking them down in the future. You've had success against others domestically. Yes, Your Honor. We've had the net winners, net losers, Judge Jacobson, I've had that before. So we know domestically that there has been some success with people who got early withdrawals and got out of the fund, at least they thought fortunately at the time, who then had to . . . that you clawed back some of the monies. That's true, and not only that, this court has also had experience with some distributions by feeder funds. The Tremont litigation, which was disposed of in a summary order by this court, involved a redistribution by a feeder fund of some money. Were all these feeder funds investors, net winners, all of them? No, quite the contrary. There were some net losers as well, just as there were in this country. Correct, Your Honor. The big three, Fairfield, Kingate, and Harley, were all net losers. Net losers? Net losers. The feeder funds. But people within them, individual investors, some of them were net winners. Correct. That's who you're going after, not the funds, but the people who got the money? Yes, although to Judge Jacobs' point, those who were actually net winners will presumably be the ones that have to cough up some money, and net losers, although they might have to cough up some money, will get some money back through the feeder funds. Now, let me just spend another couple of minutes on the extra territory. You said the net losers within the feeder funds will get some money back through the feeder funds? The feeder funds don't have any money. No, but they get money as a result of the trustees' actions, or at least some of them do. Proportionate to what the trustee collects and their losses, correct? Well, no. It's more complicated than that, and it depends on the results of litigation, but the Fairfield funds have settled. I knew it was more complicated than that. Yes. Well, the Fairfield funds have settled, and there is a detailed settlement agreement approved by this court and approved by a court in the British Virgin Islands that sets formulas for how money recovered by the trustees is divided . . . by the trustee, excuse me, by my client, is divided between my client, the trustee, and Mr. Chris, the liquidator, for the feeder fund, for the Fairfield funds. Presumably, when the feeder funds get money, don't they have to distribute it according to their documents, to their founding documents, and therefore, wouldn't they have to distribute it even to the net winners as well as to the net losers? It depends on their founding documents, just as you say, Judge Jacobs. Our concern is getting the money back into the made-off estate, and once we've gotten the money back into the made-off estate, it can be distributed to customers, depending on whether they're net losers or net winners. Indirect investors through feeder funds . . . Do you consider a feeder fund to be a customer? Absolutely. So it goes to the customer, the feeder fund? Right. But the feeder funds investors are not themselves customers. That doesn't mean that they're completely out of luck, but it does mean they don't have SIPA claims. It means they have to get back whatever they get back through the feeder funds, and how that is determined is the feeder fund's concern more than my client's concern. That's the distribution end of things, which is not really what this is about, whether you can pursue assets of the estate that were transferred to feeder funds and then distributed by the feeder funds. You're just following the asset . . . That's correct. . . . into the pockets of whoever has it. That's correct, and that's what Section 550 of the Code allows us to do. Let me say quickly on extraterritoriality and the move to comedy. The Supreme Court's Western GECO decision, which the parties have discussed in twenty-eight jail orders, very much helps us on the focus point. I won't dwell on it, but I would like to commend that to your attention. On the statutory interpretation point, if we don't win the focus point, or if the Court chooses to reach the statutory interpretation point first, we commend the Fourth Circuit's analysis in French, and in particular the phrase interest of the debtor in property is used in 541 and in 548 and should have the same meaning in both. That's de novo for us. Yes. We know that in 541 it's worldwide, and that applies to all seven paragraphs of 541. This Court's colonial realty decision deals with when property becomes property of the estate, but not where an interest of the debtor in property may be. Well, the district court was unimpressed with French. He specifically was not persuaded by the reasoning in that case. Isn't that correct? The district court was not persuaded. Right, by French, which says that the estate is what it is, and the losses are part of the estate once they return to it, or they never left it. Well, there's different strands of analysis there, Judge Pooler. Footnote 2 in French says we need not decide when property fraudulently transferred becomes property of the estate. We need not address the colonial realty versus mortgage America question, because that's a when question. Extraterritoriality is a where question. So Judge Rakoff's ground for disagreeing with French, we respectfully simply confuse the where and the when. I'd like to move to comedy. Well, briefly, Madoff's a domestic debtor, but he has assets in Switzerland. The trustee . . . or Picard can reach them, can't he? Yes, Your Honor. Parts of the estate, because it doesn't matter where the property is, right? Yes. So if the district court is right, but Madoff makes a fraudulent transfer in Switzerland, notwithstanding the fact that it's his property over there, and then transfers it over there, his interpretation would be that you couldn't avoid the transfer. It's an enormous loophole, and that's why so many bankruptcy professors . . . That makes no sense. I agree, Your Honor. I mean, and the interests of the estate are defined as legal or equitable. Yes, Your Honor. You have a claim, an avoidance claim, based upon an intentional divestment of assets from the estate, which seems to me to be in the nature of an equitable claim at the time of the filing of the bankruptcy petition. Yes. And cause of action. Yes. And it's customer property under SIPA as well. Property is encumbered at the time of the cause of action by your claim with regard to the fraudulent transfer. Yes. Appellees are trying to use comedy as a shield to protect themselves from liability altogether. Comedy exists to prevent interference with the affairs of other nations, but no foreign liquidator has come to this Court to support appellees. And that's no surprise, because foreign liquidators' interests are adverse to those of appellees. And they haven't objected? No foreign liquidators have objected to you seeking this relief from us? That's correct. And no foreign nation has sought deference either. Quite the contrary, the BVI Court approved the trustee's settlement with the Fairfield liquidator, which contemplates that these claims will be pursued here in New York. How much money were we talking in the Madoff funds that were lost? What are the claims, the cumulative claims against the Madoff fund? Right now, $19 billion. $19 billion. And how much money actually was in the Madoff? How much have you been able to claw back for distribution? $13,301,000,000. $13,000,000,000. And so it's a domestic debtor who's got $6,000,000,000 worth of debt still outstanding? Yes. That sounds like a substantial United States interest to me. Well, absolutely, Your Honor. And let me add with regard to the United States interest. It's not just the interest in clawing back fraudulent conveyances. It's also the interest in protecting investor confidence in markets. The whole reason that the Securities Investor Protection Act was passed in 1970 was that confidence in U.S. markets was lagging because of failures of broker-dealers. And Congress acted to further the important U.S. interest of restoring investor confidence and deem that interest so important that if all else fails, up to $2.5 billion of taxpayer money, U.S. taxpayer money, can be used to compensate the customers of a failed broker-dealer. Now you've got me interested, Mr. Well, that's 78 Triple D-H, and it's mentioned it's page 26 of SIPC's brief. Now, even aside from SIPA, the Supreme Court recently decided a case called Merit Management and reminded us that the avoidance and recovery provisions of the proposed quote, that's Justice Sotomayor's opinion for the court. There's just nothing unimportant about those principles or about treating similarly situated parties the same, whether they invested from here in the U.S. or from overseas. Now, as we've discussed a little bit already, Judge Rakoff thought it was important that the appellees are not treated as customers with claims under SIPA, but that it doesn't, it's true as far as it goes, but it doesn't follow that they don't The rationale of comedy, as this Court said in Maxwell 22 years ago, is to allow for an equitable, orderly, and systematic distribution of the debtor's assets. The only place that could happen in Maxwell was England. The only place it can happen in this case is here. Thank you. Good morning. Good morning. May it please the Court, Josephine Wang for the Securities Investor Protection Corporation. These cases are brought to recover property, money that was deposited by investors with their U.S. broker. The money was placed by the brokerage firm into a bank account in New York. The monies were then withdrawn, misappropriated, used by the brokerage to pay other investors fake profits. These monies that the investors deposited are what is called customer property. That's a defined term under the Securities Investor Protection Act. It specifically includes unlawfully converted property. So no matter where the monies are sent, no matter how many times they get transferred, those monies are still property that belongs to customers. The focus of the relevant provisions here, Sections 550, 548 of the Bankruptcy Code, and Section 78FFF-2C3 is on the depletion of property. To prevent property from being depleted for the benefit of creditors. When you say property, you mean the estate, the bankrupt estate? Customer property in this case, property that, the stolen property from customers. The focus of the action that's, or the acts that are relevant to the focus of those provisions was the removal of the property from the account, from the bank account in New York. That was domestic activity, not extraterritorial. There is no issue of extraterritoriality in these cases. Where the monies went is immaterial, it's irrelevant. The main focus was in New York. We believe that the court also erred in relying on comedy. There is no conflict between US law and foreign law. The BVI court itself signed off or approved the settlement agreement that would allow these cases to go forward. Furthermore, the interests of the US are much, much closer to the losses in these cases. First of all, it was money of investors of the US brokerage firm that was stolen. Also, there's very important public policy at stake here. The securities industry is a highly regulated industry. Not only from the beginning when the firm becomes registered as a securities broker dealer, through the time that the broker has to maintain or meet certain financial responsibility requirements. And even up until and through the time that the brokerage fails. It's important that investors know that even if a brokerage fails, their assets will be protected. A SIPA trustee cannot be put to the burden of having to travel throughout the world to try to recover stolen customer property. He cannot be made to go into foreign courts, have foreign law applied at the risk of inconsistent judgments. That is simply not what is intended for or provided under SIPA. SIPA gives the US courts exclusive jurisdiction over the debtor and its property. Yes. Expands the powers of a bankruptcy trustee. Absolutely. In terms of its international reach. Absolutely. The SIPA by itself gives the US courts exclusive jurisdiction over the debtor and its property no matter where that property is located. And it's important to emphasize that what we are talking about is converted customer property, property that was stolen from customers. It simply doesn't make sense. It simply doesn't help investors. It doesn't go to the whole focus of the statute, the whole point of the statute, which is to reinforce investor confidence. So that they invest, so that we have strong markets, a strong financial system. It doesn't make sense for the trustee then to have to go throughout the world to try to recover the stolen customer property. That is simply not the focus of SIPA. It's not the point of SIPA. It is not what Congress intended. Congress intended for these suits to be heard by the US courts and nowhere else. And the BVI court itself would not disagree. If the court has any questions, I'll be happy to try to answer them. But if not, we rely on the points stated in our briefs and we support the position of the trustee. Thank you. Thank you. May it please the court, I'm Frank Vili. I represent Bank Austria Worldwide Fund Management. But I speak here for the defendants who were dismissed on extraterritoriality grounds. And I will address the extraterritorial points first. Mr. Maloney will address the comedy points, my colleague. I have to take issue with Ms. Wang's point about 78-LLL-4 about customer property. Customer property includes the proceeds of converted or stolen or customer property that, in other words, if Mr. Madoff were to convert $10 worth of proceeds and only got $5 back for it, the $5 is the customer property, not the original stuff. In addition to which- He stole $5 from me and gave it, and then gave it to Mr. Jacobs. What's that? What about that? Can't SIPA chase that, or are you telling me SIPA can't chase that? Of course it can, but not extraterritorially. Why not? Because SIPA does not provide for extraterritoriality. So you're saying that anyone who wants to do a preference better get it offshore quick and into somebody else's hands so that US courts can't reach it? That is the nub of the matter. We have to read the statute that we've got. Even though the bankruptcy trustee can travel across the ocean and look for equitable claims of the debtors? He may do that under foreign law. That's what he does, and that's what he's done in this case. But his premise, his right to do so, is that a wrong occurred in the United States. A fraud occurred in the United States. That's what empowers him to do it. US law empowers him to do it. You would say that a fraudster who transfers something to a creditor in Switzerland to the creditor's benefit, is that that fraud's not reachable? No, I would not say it's not reachable. I would say that the statute does not reach extraterritorially. Therefore, the trustee- Where did the wrong occur? Where did the fraud occur? There is a fraud in the United States. And that is the basis by which the trustee can vacate the transaction, is it not? Your Honor, this gets to the heart of the question you asked, Mr. Engler, which is, is section 550A2 simply tracing? It is not. 550A2 has defenses, and the defenses are in 550B. That is true, and- It's true it has defenses, but the right, the substantive right to go after the property stems from 548. Allow me to pursue the question, I thought- Well, no, you answer that. I get to ask the question, you get to answer. Does not the right stem from 548? It begins with 548. It begins, it begins, it ends at 548. If it's a fraudulent transfer, it is. Now, there may be some defenses under 550, but those are defenses under US law. So I take it that 550 does have extraterritorial application. No, Your Honor. Allow me to explain. There are defenses under 550B under US law, but there are different defenses to a transfer that takes place abroad. And those different defenses are in contrast and conflict with the law that the trustee would seek to apply here. In fact, there's no question about that on this record. SIPC, in its brief at page 35, concedes that the trustee would apply law which differs from the foreign law which would occur, which would have to be applied if we were to look at the transfers that actually took place overseas under foreign law. So I hope that that addresses your concern. You argue that the crucial transfer is from the FEDA funds to their investors. That's the transfer that we should be considering, not the transfer from the United States from Madoff to the FEDA funds. Exactly, and the reason for that, Your Honor, is that I wanted to address this point first. Is this a domestic application of the statute? That's the question that we're all going to have to grapple with here. And in the Western Gecko case, the Supreme Court said, determining how the statute has actually been applied is the whole point of the focus test. So what are we talking about here? How has this statute been applied? Who is suing whom and for what? What's happening here is the trustee is suing under 550A2, which gives him the power to try to get subsequent transfers. And who is he suing? He is suing, according to the trustee, the bankruptcy court- which is right under 550A. Where does he get the authority under 550A? He doesn't get it from 550A. He gets it from 548. Your Honor, I beg to differ. He gets it from 550A2. If it weren't in the statute- Without a declaration that it's fraudulent, he's got nothing to chase. I agree. However, without 550A2, he's got nothing to recover. That gives him his power to recover. And there are specific defenses to it which differ from the foreign law and the foreign law. So how is the statute actually being applied? This is an important point. The trustee is suing these defendants. The bankruptcy court read 80-plus complaints, and here's what he found that the trustee had alleged. Every single one of the defendants who was dismissed on extraterritoriality is a foreign person. Every single one of them got his transfer from a foreign person. There was absolutely no allegation that any of these transfers took place domestically. So how is the statute being applied? The bankruptcy court concluded, and we conclude, that it's being applied extraterritorially and impermissibly extraterritorially. Let me ask you a hypothetical. Yes. It helps to clarify this in my head. Let's say that the bankrupt estate possesses a statue, and the statue is stolen from the- it's given by the estate for no value, and it's taken to the United Kingdom. And then from there, it's taken to Italy. Why can't the bankruptcy trustee seek to get it back in Italy? He can seek to get it back in Italy. And what is the distinction here? The distinction is whether our statute applies extraterritorially. I- I- I- I'm sorry, I thought I was addressing your question. I- I was asking whether- whether the bankruptcy trustee, under American law, American bankruptcy law, can seek to recover the statue, which is now lodged in Italy. We argue that he cannot. And the reason for that is that the statute does not reach extraterritorially. He has other remedies. He can go to Italy and seek to get it back. If the person he seeks to get it back in Italy is in bankruptcy, in a liquidation, he'll have to stand in line in that bankruptcy, in that liquidation. Because the whole point of the presumption against extraterritoriality was to prevent collisions of U.S. law and foreign law. And there's no question here that the foreign law differs from the law that- that you would have the trustee go get a statue. How is your argument impacted, if at all, by the fact that nobody abroad seems to be complaining? No government seems to be complaining. I- I don't believe that it is usual or customary for American courts to worry about what some foreigner says about our law. But we must read these statutes. But we'd be much more interested if they were complaining that we were overstepping. And, uh, none of them are, as I've been told by opposing counsel. I think- I think the issue of what the amici say in the case is an issue of whether the amici have said something that moves you, whether it is, uh, appropriate or not. I think that the issue here is a- is well put. What is the nature of the- what is the nature of the, uh, trustee's interest in the, uh, uh, estate of Mr. Madoff's fund there at the time of the filing of the- of the petition for frau- for transfers that are fraudulent? I'm- He has a claim, right? I'm sorry? He has a claim. The trustee at the time of the filing of the petition- Yes. Acquires these- the- the property of the estate. Yes. Right. And the property of the estate is defined as legal or equitable, correct? Yes. And does not the trustee possess at the time of the filing of the pro- of the petition a claim to avoid the fraudulent transfers? He does have- As the property- He has standing to make- Excuse me. As the property transfer. He- he has standing to make such a claim. That's correct. He possesses a claim. He has a- he has a claim. He has a show as an action, right? Perhaps. Does it not encumber the property? I believe not. You believe not? I- I believe it does not. Ah, how could that be? He has a claim against the property. It most certainly encumbers it. If- if someone- if- if someone has a claim against you for your- with regard to your property, okay, and- and it's enforceable and it's identified in the statute, they definitely have a claim. That is the exact s- situation of the Fairfield Greenwich case. There, um, there were lawsuits against these defendants, third party, uh, transferees, by other parties, not by the trustee. And they pur- they purported to settle their claims. They wanted to settle their claims. The trustee goes into court and ends up in the second circuit and says, I have an interest in these claims. They can't do that. This court holds, no they don't. You do not have an interest until it's recovered. He has an interest in those claims, but he has an interest in the property. And so I don't- what I don't understand, if he has an interest in the property that's equitable, 548 clearly tells him- or 541 clearly tells him it doesn't matter where the property is located. I would- It's encumbered. I would respectfully suggest that Fairfield Greenwich and Colonial Realty are then- would have to be overruled by this court. Well, I might disagree as to what they mean or as to- or, or the- how far they stretch, but go ahead. Okay. I think we, I think we are clear that what is being applied in this case is a, an effort to recover foreign transfers, indisputably foreign transfers. Well, property located foreignly, and no doubt about that, but the question is what, where does the trustee get the right to do so? And the right originates in New York, in the United States under the ability to, to, under 548, there's no doubt about that. There's, I mean, that's beyond repute. He may seek to avoid the transfer under 548, but to recover it, he must use 550. And 550- And what is his substantive right to it? It doesn't spring from 550, it springs from 548. I mean, you're forgetting half the equation. I mean, just focus solely on the right to trace doesn't tell you, tell us anything about what the nature of the right is. The nature of the right is the right to recover and it's statutorily granted. If what, what we have is a situation in which the trustee would impose U.S. law and limit only to U.S. defenses, transfers that plainly took abroad, took place abroad and took place abroad under foreign law where the, where the defendants- Say this was Madoff property and Madoff had an account in the Swiss bank and Madoff fraudulently transferred money to, in a Swiss bank account to one of his creditors such that it was voidable under 548. Would 548 let him do it? Absolutely would let him do it because it's property of the estate. So 548 definitely has an extraterritorial reach. If it's property of the estate at the time of the transfer, absolutely. 541A1 covers it. Clearly, then tracing clearly can apply extraterritorial, extraterritorially if it's attempts to trace property of the estate. Is that true? If it's property of the estate, which means post, post filing. That's a disagreement, isn't it? When it was property of the estate. You say it was only property of the estate after the second transfer? No, I don't. I say the hypothetical would be true. Judge Wesley's hypothetical would have force if the transfer were a transfer of what was in fact a state property. It would, it is 541A1 only includes property as of the filing. Property that's been transferred, fraudulently transferred prior to the trustee and is no longer in the estate. And that is the holding of Colonial Realty in Fairfield Greenwich. The estate fraudulently. That's the point. We understand that. But when it's recovered, it's recovered as property of the estate. Correct? Once it's recovered, it becomes property of the estate. So it was property of the estate. Then it was fraudulently transferred and was no longer property of the estate. Then when it was recovered, it became property of the estate again. If it were, it would be. Yes. I've been giving you a hard time and I apologize because it's quite all right. I've known you a long time, but let me ask you this. If someone had stolen it, take it today. It's a piece of art and they stole it and they went to Switzerland. Okay. Could 550 go after it? You bet your life they could. So, because why? To answer your question, a transfer from the United States, such as the Well, let me make it easier. It goes, it goes to Switzerland and then it's given to my, to a niece, a favorite niece. Okay. Is that transfer traceable under 550? No. You bet your life it is. It's traceable. It's stolen. Whose property was it? You don't acquire anything when you steal something. With respect. The issue is traceable, but your position is not recoverable. But it may not be recoverable if the statute doesn't reach it. It would have to be recoverable under foreign law. Suppose there was no second transfer. Somebody takes something from the estate or is given something from the estate and a fraudulent transfer in the United States, gets on a plane, goes to UK and then goes bankrupt. And this thing is within that person's bankrupt estate. If the initial transfer under 550A1 was a domestic transfer, there is power under the congressional power and under the presumption against extraterritoriality to recover that. That's true. That would raise issues of comedy, which I think brings us to my colleague. Thank you very much. Good morning. Good morning, Your Honor. Tom Maloney on behalf of HSBC. I'm going to apologize a little bit because I had operations on two of my eyes this summer for a detached retina. So I may have to lift my glasses up and down to see my notes occasionally, Your Honor. We had no trouble seeing you. Okay, good. So. Lordy, I know exactly what you're talking about. Okay. So let me, let me start Judge Wesley with what I think are, is a fundamental, two fundamental points of confusion and error and misstatements that have occurred so far. One is. Not my part? No, Your Honor. Never made some statements. By counsel before you. Yeah. I just want to make sure I know you're on judge Wesley. I, I've never seen you to make a mistake, uh, in state or federal court. Uh, the, the two mistakes are one is five fifties is absolutely a liability creating provision. It's not a remedial provision. So that's the first total mistake. And specifically, let me, let me tell you the elements of a five 50 claim, Your Honor, and the elements you heard from counsel that there are no defenses. That's, that's ridiculous. But, but if you look at a statute, the first element of the, of the five 50 claim is the transaction has to be voidable, avoidable and under 548 or 547 or, or, or something, but, but in the cases here, most of these transfers were never avoided, none of these transfers were actually because Fairfield entered into a settlement. It wasn't avoided. Uh, King gate has, the transfer has not been avoided. So it's going to be an affirmative element of their case to prove that they could have avoided under 548, but that's just an element of their case. What else do they have to show? They have to show the U S defenses. Fairfield did not assert a 546 E defense. We'll have that overseas. Uh, we're going to have defenses based on look, look back. Periods are different under, under the U S law and under the foreign laws. Uh, that's an issue about conflicts, but the look back periods and to be the eye is six months, unless you're an insider and it's two years under U S law to look back period, it's much longer. They have to do tracing if they pursue it here, which they wouldn't have to do if they pursued it under Cayman law, right? If you're conceding that it is extraterritorial, it does apply extraterritorial if it is, no, I'm not getting, I'm just pointing out this is a liability provision and that, and then, then none of this is an argument that it doesn't apply our extraterritorial is just how it applies extraterritorial. Well, I'll get there, but I think I want to get to the point that it's liability provision. There's a good faith defense. Uh, and there's a fair consideration defense and there's a statute of limitations defense. So this provision creates, this is a, it's a standalone provision, five 58, it creates liability with respect to the second transfer. Five 48 by its terms. If you look at it, your honor only avoids the initial transfer. It provides no remedy as to the second transfer. None. Yeah. But you don't ever get to the second part of the liability to you do a, but you don't, but, but a doesn't get you anywhere because it doesn't even look, it doesn't even void the, uh, the secondary transfer only voids the initial transfer, you don't get to five 50. If you don't have a five 48 or five 47 or something, please. Right. But I just, we're talking about five 48. So you don't have to, you know, that doesn't do anything. Right. Sorry, your honor. But, but, but, but there are specific defenses, good faith, uh, uh, and, and, and fair consideration. Second issue, your honor. I want a point of confusion is we're talking about cash here. We're not talking about a statute. And for most of these cases, we're talking about shareholders in a foreign fund, Harley, King gate, uh, or, uh, Fairfield who redeemed their shares and got paid cash. I stole a hundred thousand dollars from judge Jacobs before he went bankrupt. Right. I stole it from him. Right. I went to Switzerland and I gave it to my favorite niece. Could the trustee come over and chase it? You went to Switzerland and you bought a, you bought a, bought a house. Cause I really love my niece. I think that the law, New York law and law over the whole world does not encumber cash. I'm sorry, your honor. There's no, there's no lien on cash. There's no lien on cash. Even if you stole the cash, when you actually give cash to somebody else under New York law, under no law, is there a lien on cash? I still has to be negotiable. I saw he's, he has a lot of great art. And so I stole his Monet. I think that'd be a different case, your honor. I brought it to my favorite niece over in, in, uh, uh, Switzerland. And then he goes bankrupt. Can the trustee go after that? I think the trustee could go after that claim, but, but in, for my party argument, the comedy party argument, uh, which I'd like to focus on now, uh, if there had been a, if there had been a Swiss bankruptcy proceeding, uh, and let's say there, the person who stole it had a lot of Swiss creditors, right. And, and, and he stole from a lot of people, uh, the person in Switzerland, not my hypo, uh, but that is, what if he, what if he, what if he sold it to me for a quarter of its value? Cause he was short on some cash. And I, and then I quickly spirited across the Atlantic and gave it to my niece in Switzerland. So it's definitely a fraudulent transfer. Can the trustee go after it? I suspect the trustee is going to be permitted under Swiss law to go after it. No, no, no, no, no. I'm not interested in Swiss law. I'm interested in 548 and 550. So can the trustee go after it? Uh, if, if the transfer occurs of a painting over the United States, paint this painting, stole the United States, it's then retransferred overseas. Uh, uh, I don't, I think the trustee is going to have to rely on, on foreign law, uh, to pursue that claim. I don't think he's going to use 550. I don't believe 550 is going to permit the trustee to apply extraterritorially to seize that painting. But that doesn't mean he's not going to have other remedies in your hypothetical. And, and, and, and to the comedy issue here, let's get back to get back to my outline, because I thought it was important to cover up. I want to cover just a couple of other points on the first part of the argument. If I can just to clear up, I think two other points, where did the fraud occur? That's never been important. Never been important. Not important in Morrison, not important in the Logan Scobia case, which your honor, uh, judge Jacobs decided. So, uh, the Supreme court has said that's not an important consideration that, that the underlying fraud occurred somewhere it's where the transfer occurred. So I think your honor is on the right point on a transfer, but where the fraud occurred is irrelevant. Second, uh, the judge Rakoff said the foreign creditors are going to get little or no benefit from these recoveries. Why did he say that? Let me, let me, let me give you a record site that will help you understand what's really going on here. If you look at SPA 886, you'll see that the foreign liquidators in Harley had a $1.3 billion net equity claim. They walked away from in the U S proceeding when they defaulted. Uh, the trustees claim is $1 billion, but he effectively, by virtue of them not pursuing that $1.3 billion claim, he effectively has recovered 95% of that money based on the distributions he's making. Uh, and, and so, and the Carly investors who he's going to go after, who he says he's going after the net losers and net winners, because they're basically all net losers because they had a net equity claim. All of these entities had net equity claims. Fairfield had a $1.2 billion net equity claim that they compromised for 20 cents on a dollar. Let me ask you a sort of a primitive question on the issue of comity. Following up on judge Wesley's question about the painting, uh, that was either stolen or transferred for insufficient consideration and then ended up in another country, uh, assuming, just assuming that the, uh, U S trustee can follow it and, uh, and, and, and take it. Aren't all issues of comity pretty well subsumed in the question of whether, whether the trustee is going to be able to get that painting. After all, the painting is in Switzerland. If the Swiss police say, no, no, you can't get it. Then you're not going to get it. And if you go, and if you want, if you want the money, uh, in a Swiss bank, well, you can't get money from a Swiss bank, but let's say it's a UK bank. Uh, then, uh, then, uh, and the UK authorities say, no, then you have to go through the UK court system in order to, to levy on, on, on, on, on the asset. So if you can, I mean, if, if, if Mr. Picard can do that, then why can't we conclude that there is no problem with comity? Well, he can, Your Honor, because, because he went to the Cayman Islands and he tried to apply U S law. Uh, and, and this goes to whether the governmental interest of Cayman Islands in the, in the Primeil case and the Cayman Islands court said, we'll let you pursue under our law, but U S law has no relevance here. Isn't that, isn't that sort of, uh, uh, doesn't that, that sort of take care of the problem? No, not to the extent it can get jurisdiction in the United States over some of these people. And, and, and, and in essence, try to do an end run around the liquidation proceedings, uh, in, in these, in these cases. And, and, and I have to tell you, Your Honor, that's not true, Your Honor. Uh, all of the far, we have two amicus briefs. We have amicus briefs from all professionals in the BVI. We've had amicus brief from all professionals in the Cayman Island as a practical matter, because they're colonies of not really colonies, but still territories of England for them to get England to weigh in on before Your Honor, they're not weighing into unless and until this case gets to the Supreme court, that's just the reality of, of what these nations are going to do. No nation wants to be the first one to file an amicus brief unless some other nation files an amicus brief. And for, for these, for these territories, they don't have their own really independent governments, but we do have their, their complete insolvency bar of both those territories have filed amicus briefs here. So they clearly have an interest in this case. And we have the indication of the Cayman appellate courts that they have an interest and believe Cayman Island laws should apply. So you have a, you have a clear indication of, of, of a foreign interest here, Your Honor, uh, but, but basically what's going on here is they're doing, trying to do an end to rent and run around the U and you, and also to the extent that somebody is paying for this civic proceeding, it's the U S securities industry, uh, and they have filed an amicus brief SIFMA in our favor. And the reason why they filed an amicus brief in our favor is they said the need for dependable rules that govern. Let me give you two simple hypotheticals. I'm an investor in, in, in, in Switzerland. This is a true, this is a absolute, absolutely correct, true hypothetical. It's not based on, on, on facts of making up. This is the facts of this case. I invested in through HSBC's private bank in Fairfield, $10,000. I lost my money. I'm now being sued or I got back 5,000 of the $10,000 I lost. I'm being sued for $5,000 by, uh, Mr. Madoff and I'm being sued by Mr. Madoff's trustee, Picard, and I'm being sued for $5,000 by the Fairfield. The same, I'm being sued by both of them, the investor. Picard is only suing net winners. No, he's not. He's suing everybody. Uh, and as he said, they're suing net, they said net loser will get some money back. It's more complicated because the money will flow in two directions. No, it won't, Your Honor, but you'll only flow in one direction. The reason why that will be is because he disallowed the Harley claim in his defaulted and pay, that's why I said they effectively have gotten paid back $900 million and in Fairfield, he cut it. He eliminated 80% of the claim as part of the settlement. So the only 20% could possibly flow back. Uh, and, and, and, uh, and even of that money, I'm sorry. There is a backflow. And we talk about 20% of money at this magnitude. We're talking about, we're not talking small change. But I think judge was absolutely right when he said little or no benefit. I think that's, I think that's the record little because that money is going to go back as your Honor pointed out under their rules, which is going to be a net necessarily going to be able to differentiate between net winners and net losers. So the net loser, uh, in that case is going to have to pay up. He's not, his claim has been reduced by 80% or eliminated. And he's going to come, comes back. It's going to be shared with the net winners. So the net loser is going to be, that's, let me give you a second example. Supposing you're a hedge fund, a fund of funds, uh, and, and you can accept the fact that some of your investments are going to lose, right? Cause you don't, well, you're investing hedge funds that we're dealing with hedge fund investors, right? That's, that's all, all that's all made up was dealing with your investing. Uh, you're going to win some, you're going to lose some. What you can't take is that after you invested some money in Fairfield, six years later, eight years later, 10 years later, all of a sudden you have this claim, I think that the money you got back and distributed to shareholders who are no longer in your fund, uh, uh, has to be given back, uh, that's why the, that's why SIFMA's come in on our side. The money got into the fund originally fraudulently. That's the point. No, it didn't. The, this, I'm talking about the fund of the fund of funds overseas, uh, or the United States that invest or that invested through into one of these circumstances or the French, uh, Canadian pension fund that invested in a fund of funds that in turn were invested into Fairfield, uh, and, and that was Canadian pensioners money. It was not fraudulent money. Now it's 10 years after the fact, the trustee comes back and says, oh, by the way, I'm going to, you know, that money that you got back, I want it back. And not only do you have to give me that money back, but you have a foreign liquidator who says, give him the money back as well. This court has never permitted that. This never court has never permitted this type of double attack, which they're doing in the record, Fairfield, Fairfield liquidators attacking every single, uh, in collusion with the trustees attacking every single transfer. Entities are courts of equity. Are they not? So they're not going to take money back from people who've already paid the money. There are two different court systems. And they've had, they've had, they've had, they've had 10 years to work out a deal where they want to pursue one or the other, and they haven't done it. And they think, and I think that's what frustrated judge Bernstein and judge Rakeoff is that they're pursuing the same claim in both proceedings against the, uh, all of the Fairfield creditors and proceed, uh, attacking the same claim in both proceedings against, uh, the King gate that both of those things, King gate and Fairfield it's in the record, your honors in our briefs, it's in the opinion of judge Bernstein, the same two sets of liquidators 10 years in have not figured it out and they're both attacking the same transfers. US courts are bound, uh, to accept, uh, on over perhaps another jurisdiction's over-expansive view of its judicial authority. Well, at the expense, at the expense of US creditors who are, have legitimate claims against the estate, but the estate is diminished because of the fact that the transfers occurred overseas. Is that it? No, your honor. Oh, well, wait a second. But that's, wait a second. Okay. Kip, wait a second. The, the claims that are over, are overseas are, will not be available to the, to the trustee under your view. Correct. The claims overseas are now, but the second half is completely wrong. Where the estate is diminished by the unavailability of those, of those, the funds held by those creditors. Correct. Correct. And to the detriment of whom, uh, to, to the detriment of the creditors of the foreign estate. Your honor, your honor, the creditors administered by this estate. Well, if you, if I can't answer your, your honor, you got, let me answer your question, please. Excuse me. No, you, it's a cute answer to say to the detriment of the foreign creditors, but the reality is, excuse me. It's to the detriment of the creditors of the estate with whom the trustee holds a responsibility, not to the, to the foreign ones. There's a foreign estate. There's a trustee for that foreign estate. Well, I think you're ignoring it. You said they're illegitimate overreaching. The initial transfers that are being attacked here are initial transfers for, by the foreign estate. All right. Right. And that foreign estate has, has, has, it's not me who said this. Where did the funds originate from? The funds that the funds, they argue that they originated. I think that it's probably unlikely that this tracing exercise will go anywhere because the way it worked in the real world, the way it worked in the real world is that the foreign fund would get money in from their investors in the BVI, uh, and at the same time that they were making withdrawals, uh, from the, uh, from, uh, the Badoff estate in New York, uh, whether or not those monies that they got in from their investors in the BVI, they used to pay redemption so that they didn't have to round trip the money or whether they actually took the money from New York. That's going to be a huge accounting burden on, on a foreign estates and on everybody by pursuing this cockamamie theory of, of, of secondary liability. But the foreign estates have a very legitimate interest. And your honor, it's you, this court recognized it in Maxwell that the foreign estate has a very legitimate interest in having its rules apply to the initial transfers made by the foreign estate. Thank you. Thank you. Your honor, can I make one more point? I, it tells me our time's up. Just just several minutes. Okay. Thank you. Maxwell was finally mentioned at the very end of Mr. Maloney's argument. It's this court's leading comedy precedent, adopting the factors from section 403 of the third restatement for prescriptive comedy, which are all about the importance of the U S interest, the important of the foreign interests, the choice of law analysis and balancing. You didn't hear about any of that from Mr. Maloney. You didn't hear about any of that. So what Mr. Maloney did tell you, the suggestion was that, um, these, uh, ultimate transfer ease, the ones who get the money are being sued in their own jurisdictions and by the trustee here, and that they may have to pay twice. Is that correct? That is the concern that has been expressed. It's not a real worry. Tell me why. Okay. Different analyses for different feeder funds for Harley, which Mr. Maloney mentioned several time, the liquidators of the Harley fund made a business decision not to come to the United States and file a customer claim. So there's, there's no duplicative actions with respect to Harley. With respect to Fairfield and Kingate, there are actions by different plaintiffs that involve the same ultimate assets with Fairfield. The problem is completely obviated by the settlement agreement. And by the way, Mr. Maloney referred to it as collusive. This court has rejected that directly. With regard to Kingate, it's ongoing litigation, but the, we have had our claims dismissed by the lower courts here in the United States, and it remains to be worked out what will be done to protect against, uh, uh, duplicative recoveries, but there will be protections against duplicative recoveries, whether it's because the trustee and the liquidators worked them out or because of the doctrine of res judicata, there will be protections. If someone comes to the trustee, says I already was, I already paid, I already paid back some of this money in a proceeding in the BVI, um, that would be, uh, conclusive to the trustee in terms of, uh, further pursuit of the funds? I, I can't make that commitment as I stand here today, but would it be taken into account and would both the trustee, would all of the trustee, the liquidator and a court have something to say about that? You bet. It doesn't seem, I mean, the, the point Mr. Vealy made, there are defenses available under 550. And so, I mean, it does recognize that there are instances where there are defenses available under the transfer and, and most of them pertain to the transfer and other things that would be adjudicated in a bankruptcy court. But what are situations where there might be a particular interest, uh, with regard to a transfer where there's a good faith exception or a shorter statute of limitations recognized in the area where the transfer occurred? Why wouldn't the law of that jurisdiction have something to say about that as relevant? Well, the good faith defense is in 550B. That's a U.S. defense. And, and if it, uh, is under foreign law as well, there's no true conflict. There's no, there's no comedy problem. And we're back to the statutory interpretation question. With regard to a different statute of limitations, the main point about the statute of limitations here in the United States in 550F is that it's key to the avoidance of the initial transfer. So as your Honor has been suggesting in many of your questions, the focus of U.S. law is on the initial transfer and under, uh, Western GECO and under Morrison and RJ Reynolds, that ends the analysis on extraterritoriality. So what's left on extraterritoriality is the balancing, the choice of law balancing that is conducted under Maxwell, under the restatement. And in a hypothetical case in which there were some pointed conflict, some true conflict, which is a threshold requirement under Maxwell, could there be some deference to foreign law? Maybe, but that's not this case at all. Judge Wesley. 550 operate independently of any other substantive right? Or does it, is it dependent upon tying, being tied to some, the triggering of some substantive right under another cross-reference section of the code? It, the latter. Without the other cross-reference right, 550 is not an available tool in the, in the toolbox of the trustee. That's correct. And contrary to Mr. Maloney, it is a remedial statute. Indeed, Appellee's brief calls it a remedial statute. Judge Bernstein called it remedial. They changed their tune only after the Supreme Court decided Western GECO because it no longer helps them to call it remedial, but it is a remedial tracing statute. Mr. Maloney is arguing that, um, that, uh, the, the path that, that you advocate will lead to, um, uh, conflicts with foreign laws, conflicts with foreign courts, uh, mind boggling complexities and your answer, double recoveries, and your answer really is that after 10 years, uh, these things have been met and become the subject of settlements, but those settlements, I've looked at them, they're Byzantine in themselves. So in a way you're, you're refuting yourself by saying that, that, that, that we can, we can negotiate over years and get over these problems. If it takes years to negotiate these problems, then Mr. Maloney's argument has real force. Well, I'm not sure that that has anything to do with the relative importance of the U.S. and foreign interests. So I'm not sure it helps on the comedy point. Has to do with comedy because, because, uh, people are negotiating, uh, against the background of not knowing, of not knowing the answers to questions that, that we are dealing with here. And you're saying, don't worry about those questions because they can be worked out in, in complicated, uh, settlements, which a billion flows here and a billion flows there. Well, if we just apply U.S. law in accordance with French, the only court of appeals case on point, then there is predictability. The unpredictability starts with the fact that there is an attempt to apply two bodies of law. That's not our attempt. We want the U.S. law to apply with regard to the settlement agreement applies in foreign countries. That's what it is to be a country. Uh, of course, but look at Western GECO in which the damages were awarded in foreign countries, and there were arguments about conflict with, with foreign law, the Supreme court disposed of that very quickly. It said no, because the focus is the infringement. The remedial section applies worldwide. Here, the focus is the avoided transfer, which is the Madoff transfer, the initial transfer, and it applies worldwide. I would like, since your honor brought up the settlements and their complexity, I would like to say a word. Fairfield settlement though complex is definitive. It resolves all these double recovery problems. There's no double recovery in Harley and there's not going to be any settlement with Harley because they chose not to file claims. The only lingering complexity is the, the King Gate settlement. And yes, maybe there's some complexity, but that's not a reason to set aside law that Congress intended to apply overseas. As we take as our hypothesis under the extraterritoriality analysis and say to my client, go to foreign jurisdictions and chase this money when we sue in foreign jurisdictions, we're suing the funds, not their shareholders. It's here that we sue the shareholders. Thank you. Thank you all. We will, we will reserve decision.